Good morning. May it please the Court, Mary Ann Dugan for the appellants. If it pleases the Court, I would like to reserve seven minutes for rebuttal, and I will keep an eye on the clock. Thank you. Thank you. As you know, this case has been before this Court before seven years ago. It is a ski area expansion project, many years of litigation, as you know, second time up here. But I did want to point out that the plaintiffs have consistently not challenged many important parts of the expansion project, two of the lifts, six of the runs, some parking, toilets, a ticket building, rival services building, a power infrastructure, some watershed restoration, and so on. So we really hear about the runs and the lift on the backside of Mount Ashland, which is in the watershed for the City of Ashland's drinking water. This is already listed as a water quality limited reservoir. It has sediment pollution that limits its function as a water supply, but it is the City of Ashland's water supply. The defendants admitted that the expansion would degrade, that's their word, six of the nine aquatic conservation strategies objectives that were established under the Northwest Forest Plan by impacting riparian habitat. And as they more recently admitted in the wake of this Court's 2007 opinion, the most notable riparian impacts on the north side, the backside, are the landslide hazard areas, the LHZ2 areas, which are very highly erodible steep slopes. So in our 2007 opinion, and that went on with the District Court's injunction, we said that the Forest Service needed to properly classify the LHZ2 area as riparian reserve and then analyze it properly. And so as I read the Forest Service's materials, the record, they did reclassify that area and then they did an analysis of its compliance with the aquatic conservation strategy. So the District Court then said you've satisfied the injunction because they addressed our directions and the areas that we identified, and so what's wrong with that? Well, in this Court's 2007 opinion, the Court noted that it's not just a paper exercise. Unlike NEPA, which arguably is a paper exercise designed to inform people so they make better decisions, the National Forest Management Act, as implemented in the local forest plan and the national, I'm sorry, the Northwest Forest Plan, requires substantive protections of riparian reserves. As this Court noted, the designation of land as riparian reserves has significant consequences for the management of the land. It would compel specific management practices to ensure that the terrain is appropriately protected, and specifically what the protections are, the one that we've focused on for this appeal, is that the Northwest Forest Plan aquatic conservation strategy established that within riparian reserves, priority must, and this is a quote, priority must be given to protecting existing high-quality habitat rather than compensation for degradation through mitigation. But you're really not answering my colleague's question, because as I understand it, the Forest Service classified the LHZ-2 land as, I call it RR, I have a tough time saying riparian, so now I said it, potentially unstable land. They did that in the FSAEIS, and then they said it increased the amount by 145.13 acres, and then what they said was, this results in an increase of 10 acres of vegetation, an increase of 0.56 acres in proposed grading, increase of total land by this many acres, a reduction of forested land covered by 1486, but after doing that, it went ahead and said, now we have to look at the standards that have to be set in that particular matter, and given what we have done here, it seems to us that they meet the standards that we put in the plan. So then we're back to the same boat. If I'm to look at what happened here and give deference, if you will, in the interpretation of its own plan and not substitute my own judgment for the Forest Service, how can I really say they didn't do that? Understood, Your Honor. It is a deferential standard. However, we submit that it was arbitrary and capricious for the Forest Service not to do any analysis of whether and how they could give priority, this is the quote again, priority to protecting existing high-quality habitat. Instead, they leaped to the mitigation, which is what the forest plan says you shouldn't do, on page ER-288 and on page 242 and 288. They indicated that they are going to mitigate the damage caused by logging these steep slopes that lead into the watershed, and that's despite the fact that on ER-236, the Forest Service acknowledged that the project components are going to have long-term direct effects that are adverse such that no riparian vegetation can recover, including slope destabilization. Well, but as I understood it, they said due to the relatively small change in the overall reduction forested cover, it is not expected to affect the attainment of the aquatic conservation strategy objectives. Well, they leaped to the final conclusion that it's not going to degrade. Well, but that's what they have to deal with, isn't it? Well, they didn't go through the step of saying how are we going to give priority to protecting this high-quality habitat, and that's despite the fact that, you know, 60 years ago, the Forest Service stated, and this is in the record at 291, that in municipal watersheds, because the impacts are usually permanent, the damage should be prevented, not cured. Well, in their original record of decision, I guess, well, it's also in their 2011 record of decision, I mean, they have a very comprehensive discussion of the aquatic conservation strategy and the compliance with it. The same thing was in their earlier FEIS. And so they did substantial analysis, and as I read your brief, your suggestion that this, I guess it's the WR3, did not use mitigation or planned restoration as a substitute for preventing habitat degradation has to coexist with their determination that they're doing a project, and that seems consistent because other parts of the ACS contemplate there will be new recreational facilities and new culverts, bridges, and stream crossings. So we know that they can have a project, so it isn't that the prevention of habitat degradation is a flat band. So we need to defer to the Forest Service in how they balance those different uses of the forest area. So as Judge Smith said, why are we freed from deference to the Forest Service's analysis and conclusions? What specifically did they do that violates some legal standard? They certainly have the authority to plan a project in a landslide hazard area. What they don't have the authority to do is to skip the analysis step of saying, we recognize that the ACS requires us to give priority to protecting high-quality sites within riparian reserves, and this is not a high-priority area, or it is a high-priority area. They didn't even go through that analysis. So are you saying there's specific language that's missing from their fairly extensive analysis? Yes, I think so, Your Honor, and unfortunately, every time this issue has been raised, trying to interpret and give meaning to this Northwest Forest Plan provision, it has not been addressed directly in the courts, and even though it says that priority must be given, so it's an obligation to give priority, and by that, I would say at least they have to talk about that in their analysis, and they did not. They leaped to mitigation. Don't worry about it. We're going to mitigate, and their mitigations are to divert water runoff and then to monitor for landslides, and if you monitor for landslides, a landslide's going to occur, and you're going to be monitoring it. That's not mitigation. I don't have a whole lot of time. I'm wondering if I can move on to the second issue briefly. All right. I think it's an odd little issue because it becomes a math problem in a way. The original analysis by the defendants, which was rejected by this court, was that the Northwest Forest Plan implicitly amended the Rogue River Forest Plan to remove the restricted watershed. It was a restricted watershed designation, and the court rejected that, and that was problematic for them because with a restricted watershed, they're limited to a certain percentage of soil disturbance, and they were at 16%, which is above the 15% limit that's set in part of the plan, and 10% in another part. So they reanalyzed the land classifications in the 2011 FSEIS and the SROD, right? Right. So they changed the area. So they reanalyzed them. Well, no, they changed the denominator. They looked at the entire activity area, as they're required to do. I guess I had trouble with that argument. They looked at the entire area of MS-22 lands that were affected by the activity and based their analysis on that, and I didn't ‑‑ I had trouble following your argument as to why they should analyze less than the full activity area. Well, two reasons. The most important being that it was not MS-22 land as designated in the local Rogue River Forest Plan. They would ‑‑ they have not issued a forest plan amendment, and I ‑‑ you know, perhaps because they don't want to ‑‑ the public to hear that they want to degrade the designation of this area. Instead, they kind of magically waved a wand and said, well, this other larger area where we're not disturbing soil, we're just going to stay in this area. And they started calling that restricted watershed as well, which sounds great to the public. So let me ask you this. When you say this larger area that's irrelevant, are you saying that this larger area is not the activity area, that they misrepresented what areas affected by the activity? Well, the amount of soil disruption doesn't increase, so it's certainly not an area of ground disturbing activity. They have ‑‑ And is that the definition of activity area, just those that physically disturb the ground, or do we defer to the Forest Service designation of what's affected by the activity? I guess I'm trying to understand whether your argument is that they designated a much larger area that would be reasonable as the activity area. I think that's one problem, and there are these shifting definitions of what is an activity area, and we did go into that in the brief. But more centrally, we have a very fundamental problem, which is that in the Rogue River Plan, they designated 39 acres as restricted watershed. And they said within this 39 acres, do not disturb more than 15 percent, or some of the values are 10 percent, but do not disturb more than a certain percentage of the soil. The 6.45 acres went over that limit, so then they just said, well, we're going to take this other area that isn't designated as restricted watershed. We didn't talk about protecting that area in the Forest Plan, but we're going to start protecting that area now. But they didn't go through any public notice and comment. I thought our issue in the 2007 opinion was their failure to classify, or to make a plan amendment to classify 35 acres of MS-22. to MS-4. That's right, because their original theory was, there's no way that we can build a ski area on restricted watershed, because we're going to have to disrupt soil. So then they abandoned the plan amendment idea, and acknowledged that was MS-22, and then reanalyzed it, and determined that looking at the activity area, which you claim was expanded unreasonably, but they looked at the entire activity area and said that it was not going to violate their standards. So you're arguing that they unreasonably expanded the activity area, but what's your second argument, then, that they erred in determining that it wouldn't violate the standards? The second argument is when they, in the Rogue River Plan, said, we're going to protect these 39 acres as restricted watershed. It's a very small area that's very important to the Ashland drinking water. We're going to protect the 39 acres. Within that 39 acres, do not disturb more than 15% of that area as far as disturbing the soil, which, whatever number that is, 6-point-something acres. 6.45. Well, that's the amount they are disturbing. The 15% would have been less than that. They promised the public they would protect the 39 acres by not logging more than 15%. They are now logging and disturbing soil on more than 15%. So to fix that, they have added this other area that isn't restricted watershed. It wasn't ever restricted watershed. Isn't it true that in the prior situation that the Forest Service had not previously defined the activity area? I think that's true that they ---- Frankly, they just defined the activity area here now in this particular situation? Well, I think that they recognized in the ---- that they had to do something different with the activity area than they had done previously. But when they don't lay out the activity area, I'm having a tough time understanding why that's a problem. Well, the Rogue River Plan doesn't say don't disturb more than 15% of the activity area. It says don't disturb more than 15% of the restricted watershed. It's akin to if you had a beautiful un-asphalted hill surrounded by a parking lot, and you're not supposed to log the hill, more than 15% of the hill, and then you add the parking lot around it, and suddenly it's less than 15%. So not saying that the other area is a parking lot, but it isn't restricted watershed. It's not as valuable of a habitat. So it shouldn't be used for part of the averaging. So are you saying that there's a specific term in the plan that says no disturbance of more than 15% of restricted watershed area, and there's also an identification of this 35 acres as restricted watershed? Is that your argument? Yes. Yes. 39 acres has been and remains the designated restricted watershed in the plan. They have now, for some reason, well, we know why, but they have now said kind of arbitrarily, well, we're going to just call this other area restricted watershed, even though it isn't designated as such in the forest plan. Do you want to reserve the rest of your time? Good morning. May it please the Court. Robert Lundman, representing the United States Forest Service. I'm planning to use 15 minutes and leave 5 minutes for Mr. Maynard, who's representing the National Association. I'll start with the restricted watershed or MS-22 issue that the Court and counsel are just talking about. One first initial clarification, the prohibition that's at issue here is the 10% prohibition. It's not 15%. It doesn't apply to MS-22. I'll quote it. It's at SCR 358, Supplemental Excerpts of Record 358. Prohibit more than 10% of an activity area to be compacted, puddled, or displaced. So it's not a reference to MS-22. It's a reference to activity area. And Judge Smith is right. This remand was the first time that activity area was defined in this case. It's not defined in the prior and the prior appeal, before the prior appeal. The problem that led to the prior appeal was, of course, the lack of clarity about the analysis of the MS-22. On remand, the Forest Service here clearly has defined the activity area as the denominator, and that makes sense. It's the area that's being impacted by the additions to the ski area. So the counsel says that the Forest Service has unreasonably expanded the activity area, and it's not limited to the area that's disturbed, that has ground-disturbing activities. So what was the basis for identifying that area as the activity area? I do not know what exactly she's talking about, because the 74 acres is the area that's being disturbed. It's the area of disturbance that's proposed for the ski area. This is not a case where the Forest Service circled some additional area that's not being impacted or changed. They haven't made that argument before now, so I don't know exactly what the reference is to. The Forest Service's approach here makes perfect sense, because all of this area is in the City of Ashland's municipal watershed, and the point of Restricted Watershed Management Strategy 22 is to protect municipal watersheds. So the idea that the Forest Service should just not look at some of the impacts from the municipal watershed would be a significantly less environmentally protective result. If counsel for plaintiff seems to be arguing that we'd be better off somehow if the Forest Service had put all this land into developed recreation, but of course if the Forest Service did that, these management strategies that the Forest Service analyzed simply wouldn't apply anymore. So we'd have an expansion that would not go through the analysis of whether there's too much soil compacting and puddling and displacement. Instead what the Forest Service here did is analyze the expansion, analyze just the activity area, and confirm that it complies with the standard, thus further protecting the City of Ashland's watershed versus just taking it outside this box entirely. Let me just address just one other specific thing that opposing counsel said in response to my questions, that there was a specific term that the Forest Service couldn't disturb more than 15 percent of the water and the 35 acres at issue are restricted watershed as compared to the rest of the area. Is that correct? I'm not sure where the 15 percent is coming from. The standard that she cites in her brief is the 10 percent standard from S.E.R. 358, and that's the only one addressed in her brief, I think. So I don't know what the 15 percent is a reference to. As I understand it, the requirement are no more than 10 percent of an activity area may be compacted, puddled, or displaced upon completion of the project, correct? That's right. And that's what we're talking about here. And that's the exact language from the management strategy. The question of whether the Forest Service could have had to do any analysis of this management strategy, sure, that was one path after the prior court of appeals opinion. But the prior court of appeals opinion in no way prohibited the Forest Service from taking the case back on remand and applying the management strategy. And the Forest Service here quite reasonably decided that it's better for the long-term protection of the forest to leave this land as restricted watershed and to analyze it pursuant to those standards. It's consistent with Restricted Watershed Standard 22, which also provides that when there's a conflict, look to these water protection measures. And we cited to that language in her brief, and that's in the Restricted Watershed Management Strategy. Unless the Court has any more questions about that standard, I'll turn to the other two issues that counsel addressed. There's the ACS or Aquatic Conservation Strategy objectives. And as the Court pointed out, the supplemental ROD and the supplemental EIS lists each objective, especially the supplemental ROD, then analyzes each one and cites to where else in the record there's support for compliance with the objectives. So we think that analysis is more than sufficient. So opposing counsel said there was not enough discussion of the WR3 requirement to not use mitigation or planned restoration as a substitute for preventing habitat degradation. Right. So the other, the final issue is that WR3. We think there is, the record is clear and sufficient on that. You know, the primary way this Forest Service, what is approved here, avoids impacts is through the design of the project. And the analysis in the supplemental ROD in the last go-round as well explains that great care was given here to avoid riparian areas wherever possible, that the ski runs are put on ridges where there's no riparian or less riparian land than if it's along, down closer to the streams. And so we think that the primary way here of avoiding impact was that way. Sure, then, there were some impacts, and that's where the supplemental EIS and supplemental ROD details those riparian reserve impacts and then says, here's the design of the project to avoid the impacts in the first instance, and then there are some impacts remaining and there are further mitigation efforts targeted specifically at those impacts. So your language there that much of the additional LHZ2 area is an upland position outside of the 150-foot horizontal distance from the original channel originally mapped is what you're responding? In part, yes. So the impacts were designed to put it away from the channel and the core... Not associated with perennial streams, correct? Right. Now, to be clear, the error that the Court found last time was that the LHZ2 lands were not classified as riparian reserves. And there's no dispute now that that error, that specific problem was fixed. Those lands were taken and put into riparian reserves, and then from there we have this new analysis. We think that new analysis completely complies with the National Forest Management Act and the plan, but in terms of what the error the Court identified was, was a classification error, and that was completely cured. At a minimum, that means the injunction was properly dissolved and the District Court did not abuse its discretion. Well, I know you took that position in your briefs, but as I read our opinion, we said that you not only have to classify it as riparian reserve, you have to analyze it properly. The District Court didn't seem to indicate that any analysis was required, but that is what our opinion said. Right. Well, I think the error identified was the classification error. It pointed out that once that's classified, it has to be analyzed properly. But in terms of an Administrative Procedure Act posture, which is what we're in here, you know, we have the first agency action that led to this injunction. It didn't have an analysis of riparian reserves in Landslide Hazard Zone 2. So I think it would at least be a stretch, and probably too far of a stretch, to maintain an injunction based on a prior administrative action that has now been replaced by a new administrative action that has new analysis. I think the right course is for the Court to dissolve that injunction, and to the extent there is a problem, then plaintiffs have their new lawsuit, which is part of the still case where it's already been appealed to this Court, but not consolidated with this appeal. So those are the three issues. Unless the Court has any further questions on any of them, I will turn it over to Mr. Maynard. Thank you. I think that his co-counsel is speaking next. If it pleases the Court, I'm Robert Maynard. I'm representing the Intervenor Appellee Mount Ashland Association, which is the nonprofit operator of the Mount Ashland Ski Area. With me here, with us here today in the audience is Alan DeBoer. He's the present Secretary, former President of the Mount Ashland Association Board, and he's actually the former Mayor of the City of Ashland, to listen. But I'll be concise. Mount Ashland Association still wants the opportunity to move forward with implementing this expansion project. There's a continuing public need to do so to improve the extent and balance of the intermediate and beginner ski terrain, the operation in windy weather, the revenue to sustain this nonprofit community ski area, and the other benefits that we've described in our brief, and it's in the record. I want to emphasize that this appeal is quite limited in scope. It is just to, it's just the district court's ruling that lifted the injunction against the project that had been in place since late 2007, and the two NFMA Forest Plan consist of the items that Mr. Lindman and opposing counsel have covered. The appellants are not alleging in this appeal any National Environmental Policy Act inadequacy regarding the analysis of environmental impact for this project. They keep, and from my perspective, they keep exaggerating various aspects of the project's risk. But there's no issue before us in this appeal regarding the extent of environmental effects or risks associated with the planned work in these riparian reserve and MS-22 restricted watershed areas. As we summarized in our brief, the record reflects the limited acres involved in this project, the minimization of vegetation disturbance, and other protective measures, a whole catalog of mitigation measures added to the careful design of some runs, ski runs and lifts that are on the ridges and the slopes in this upper Ashland City watershed area. That gets to this point of priority of avoidance over mitigation under the ASC standards. That's there in the record summarized in various places in terms of doing this in an environmentally sound way. The ACS objectives regarding degradation are not an absolute ban, as Judge Itooka said. So there is a balance there with the standards, and this Court has recognized some improvement, expansion of this ski area is allowed under the forest plans. So in this context, we simply ask that the Court defer to the agency regarding its own forest plan provisions and otherwise affirm the district court on the points on appeal. I point out this will leave the issue of whether any injunction should be issued going forward on any part of this project, leave it to the pending litigation in the district court in the first instance where it can address updated facts, and in fact, it will allow portions of the project that appellants have emphasized they don't have any objection about to go forward while those, these hopefully last remaining issues are resolved on the merits in the district court. There's some things that are scheduled for this coming year that the plaintiffs have no objection to. They're on record about, and we're in communication with them about it. I'll take a couple of seconds anyway on this to add a couple of things on the MS22 point. I, you know, with due respect, I think opposing counsel's been confused about this. There's not just 35 acres allocated to MS22 in the forest plan. This is all, and it's a very straightforward approach the Forest Service has taken at this from my perspective when you look at the supplemental record of decision and the EIS and the other summarization regarding this activity area. The Rogue River plan itself says that MS22 standards and guidelines applies to areas designated as suitable for municipal supply watershed, including the Ashland City Watershed. That's supplemental excerpts of records 351. And there's other references to where there's a lot more than 35 acres. It's really the area of the expansion project and the special use permit area that fall within this restricted watershed standards and guidelines area. And the activity area, they certainly got that right in terms of looking at the total area disturbed that's part of the expansion project. So that to me just makes the opposing counsel's facts off when you look at the record. It's pretty – I don't see how the Forest Service could have done it elsewise, and there's no gerrymandering or gaming going on here. They looked at the standard. They saw that they met it without needing to go to a plan amendment that would be formal or substance, and that's where that stands. And the only other comment I'll make is this – I'm probably out of time anyway. So there's some other points, but I think Mr. Lundman's covered them adequately enough. If you have any questions, I'd be happy to entertain them for me. Apparently not. Thank you. Thank you. So I just need to clarify that there is a 15 percent standard and there's a 10 percent standard, and they are different. In this Court and in our brief at pages 11 to 12, we are talking about the 15 percent standard. As this Court explained it in 2007, in the Rogue River Plan, the Rogue River Plan requires that, quote, management activities on restricted watershed MS-22 lands not exceed 15 percent exposure on very high or very severe erosion hazard soils. And that's 505F3 at 894, citing the Rogue River Plan. There's no mention of an activity area in that standard. The 10 percent standard is an entirely different standard, and we did not cite it in our brief. Could you just point me out? I think I have your blue brief. Where you're citing to? This is on page 11 of the blue brief. Thank you. It's the indented quote at the bottom from this Court citing the Rogue River Plan. We are not confused about the number of acres. The 35 acres is undisputedly the amount of restricted watershed in the project area, and that's in the record. It's page 71 and 102, 104, and 106 in the record. And so, you know, the fact that there may be other restricted watershed outside of the project area is irrelevant, and the Forest Service has never argued that that should be part of the equation. As far as the definition of the activity area, and then I just wanted to point out that in this Court in 2007 in ONRC versus Brong, B-R-O-N-G, which is cited in our brief, this Court rejected this repeated practice of the Forest Service and Bureau of Land Management of averaging impacts across land allocations to artificially dilute the apparent impacts. They're not doing that here, are they? They are now. They weren't originally, and then when they didn't get away with their original approach, they came up with a concept of increasing the denominator to make the percentage go down by adding these lands that are not restricted watershed to the denominator. As far as the definition of activity area, as we pointed out in the brief, blue brief, the Forest Service manual says the activity area is the, quote, total area of the entire project area, but what amount is actually going to be ground, what amount of ground is actually going to be impacted. So even if it were permissible to use the larger area, they have not defined it correctly. Thank you very much, Your Honors. Thank you. Thank you all for your arguments. The case of Oregon Wild v. Knotten is submitted.
judges: Goodwin, Ikuta, Smith